***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before former Deputy Commissioner Pfeiffer. The appealing party has shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission reverses the Opinion and Award of Deputy Commissioner DeLuca and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. An employment relationship existed between the plaintiff and defendant-employer on or about February 6, 2002.
2. Royal SunAlliance was the carrier on the risk for the defendant-employer at the time of the alleged injury.
3. The plaintiff's Form 18 was filed on March 19, 2002; the defendants' Form 19 was filed on or about February 11, 2002; the defendants' Form 61 was filed on or about February 11, 2002; the plaintiff's Form 33 was filed on or about March 14, 2002; and, the defendants' Form 33R was filed on or about April 16, 2002.
4. The plaintiff's average weekly wage was $308.60, yielding a compensation rate of $205.74.
5. The plaintiff last worked for the defendant-employer on May 24, 2002.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 33 years of age, with a date of birth of December 1, 1969. Plaintiff is a high school graduate who has completed one semester of college, and subsequently obtained certification as a Certified Nursing Assistant (hereinafter "CNA").
2. At the time of the hearing, plaintiff had worked as a CNA for approximately 13 years. Plaintiff's prior work experience included work as a painter, housekeeper and work in the food service industry. Prior to coming to work with the defendant-employer, plaintiff worked for three other nursing home facilities as a CNA. The plaintiff's employment as a CNA with these prior employers required her to perform job duties including caring for the daily needs of patients, such as bathing, showering, feeding and grooming.
3. The plaintiff first worked for the defendant-employer beginning in February, 1999. Her work duties with the defendant-employer during this first period of employment included giving showers to, feeding and grooming patients. The plaintiff continued such work with the defendant-employer until early 2000, at which time she left the employment due to health issues unrelated to the work place.
4. Beginning in October, 2001, plaintiff returned to work with the defendant-employer as a CNA. Upon her return, plaintiff's job duties included giving showers to and grooming patients.
5. Plaintiff continued to work for the defendant-employer. In early January, 2002, plaintiff was found to have kidney stones. As a result of this, plaintiff was prescribed Cipro by her treating physician, and she was out of work until February 4, 2002. Plaintiff returned to work on February 4, 2002.
6. On February 6, 2002, plaintiff began work at approximately 6:45 a.m. Plaintiff assisted residents with their morning meal. Plaintiff then provided assistance to other residents in getting up and taking showers.
7. The shower facility being used consisted of a shower stall, adjacent to an area with a commode stall, and a doorway leading from these rooms into the hallway to the rest of the Canton Health Care facility. While plaintiff was assisting one resident with a shower, the resident asked for an extra towel. Plaintiff left the shower room, went into the hallway, walked down the hall, retrieved another towel from a supply closet, and returned to the doorway into the shower facility.
8. Plaintiff opened the door between the hall and the shower facility approximately one-half of the way. At that point, plaintiff stood in the doorway and had a conversation with two co-workers, David Ferguson and Linda Kirkpatrick.
9. The conversation between plaintiff, Ferguson and Kirkpatrick lasted approximately 2 — 4 minutes. During the conversation, plaintiff was standing in the doorway, and Ferguson and Kirkpatrick were standing within 1 — 2 feet of plaintiff and the doorway.
10. During the conversation between plaintiff, Ferguson and Kirkpatrick, plaintiff lost consciousness and fell to the floor. There was no warning to plaintiff that she was about to lose consciousness.
11. Plaintiff regained consciousness and had defendant-employer to contact her husband, who picked up plaintiff and took her to Haywood Regional Medical Center.
12. Plaintiff presented for medical treatment at Haywood Regional Medical Center Emergency Department on February 6, 2002. The Emergency Room records reveal plaintiff reported no premonition of the syncopal episode, no dizziness, visual disturbance, diaphoresis, or nausea prior to becoming unconscious. She further reported no chest pain, palpitations, or shortness of breath.
13. Plaintiff was admitted to Haywood Regional Medical Center for treatment and observation on February 6, 2002. According to the medical records, plaintiff was reportedly unconscious for approximately 45 seconds. Based upon a report from the defendant-employer to the medical providers, immediately following the syncopal episode, plaintiff had an irregular heartbeat. Upon admission, plaintiff underwent a CT scan, which revealed a fractured mandible.
14. Upon admission to Haywood Regional Medical Center on February 6, 2002, plaintiff reported to medical providers she had experienced a prior syncopal episode approximately 4 months previous to this episode.
15. At the time of the hospitalization at Haywood Regional Medical Center on February 6, 2002, in addition to the diagnosis of a fractured mandible, plaintiff was also diagnosed as suffering a syncopal episode, and knee tenderness. Diagnostic studies regarding the right knee revealed no abnormality. Plaintiff was discharged on February 7, 2002, with a heart monitor. Plaintiff remained on the heart monitor for 15 days, according to the medical records from Haywood Regional Medical Center. An "Event Monitor" record from Haywood Regional Medical Center dated February 22, 2002, shows that plaintiff reported a number of events during which she felt dizzy and light-headed following her discharge from the Medical Center on February 7, 2002. Plaintiff was not working during these events. These events corresponded, according to the Event Monitor, to sinus tachycardia (rapid heart-rate).
16. During plaintiff's hospitalization at Haywood Regional Medical Center, plaintiff received medical examination from Dr. John Stringfield. Dr. Stringfield is a family practitioner. Dr. Stringfield continued to provide examination and treatment to plaintiff following her discharge from Haywood Regional Medical Center on February 7, 2002.
17. Based upon plaintiff's report to Dr. Stringfield of being in a hot environment immediately preceding the syncopal episode, and because heart monitoring did not evidence a cardiac problem, Dr. Stringfield opined the plaintiff may have suffered a syncopal episode due to heat. Dr. Stringfield noted no other probable precipitating cause for plaintiff's syncopal episode and fall on February 6, 2002. Furthermore, Dr. Stringfield noted the episodes of dizziness and light-headedness following the hospital discharge on February 7, 2002, during the heart monitoring, which were noted on the Event Monitor, could not be explained. He noted he had no indications these feelings of dizziness and light-headedness were due to heat.
18. On February 12, 2002, plaintiff was examined by Dr. John Tannehill. Dr. Tannehill is board certified in head and neck surgery. On this date, Dr. Tannehill opined a surgical repair of the fractured mandible was not absolutely essential, nor emergent. He noted that plaintiff had virtually no upper teeth, and few lower teeth. This condition was one which, existed before the incident on February 6, 2002. Dr. Tannehill noted the lack of teeth could result in poor occlusion and possible deviation of the jaw upon opening and closing.
19. On February 25, 2002, plaintiff underwent an outpatient surgical procedure performed by Dr. John Tannehill, at Haywood Regional Medical Center. This procedure was a closed reduction of the mandible fracture with application of upper dental suspension splint and application of arch bars and intermaxillary fixation.
20. On March 29, 2002, Dr. Tannehill performed another surgical procedure at Haywood Regional Medical Center. This procedure was to remove the arch bars and dental splint.
21. Plaintiff was released to return to work by Dr. Tannehill on April 18, 2002. However, defendant-employer was unable to schedule plaintiff for work until May 1, 2002. Plaintiff returned to work on May 1, 2002. By that time, she had reached maximum medical improvement.
22. Upon returning to work on May 1, 2002, plaintiff had no difficulty performing her daily work duties.
23. Plaintiff continued to work until May 24, 2002. However, on that date, plaintiff slipped in the shower at her home and suffered a torn fascia in her foot. As a result, the plaintiff was out of work beginning May 25, 2002, due to the torn fascia.
24. During the time that plaintiff was out of work due to the torn fascia in her foot, a non-work-related injury, plaintiff's employment with the defendant-employer was terminated due to excessive absences. She was informed the excessive absences were due to her time out of work due to kidney stones, her daughter's illness, and her foot injury.
25. Since her employment termination, plaintiff was released to return to work, without restrictions regarding her non-work-related foot injury. Plaintiff has received unemployment benefits as a result of being out of work. She has sought employment since that time, making at least two applications per week, in compliance with the Employment Security Commission regulations.
26. Approximately three weeks prior to the hearing before the deputy commissioner, plaintiff secured a job at Little Lambs Day Care. Plaintiff was uncertain of when she would actually begin work. Plaintiff anticipated this work would begin the first of May, 2003; and, she anticipated earning $6.50 per hour for the first 60 days, with an increase to $7.00 per hour thereafter.
27. Plaintiff experienced a prior fainting spell unrelated to her work conditions.
28. During the conversation immediately preceding the syncopal episode between plaintiff, Ferguson and Kirkpatrick, plaintiff did not complain to either Ferguson or Kirkpatrick about not feeling well; nor did plaintiff's face appear red to Ferguson or Kirkpatrick.
29. Plaintiff testified that the room was unusually hot shortly before she lost consciousness. However, neither Kirkpatrick nor Ferguson felt that the room was unusually hot.
30. Ferguson testified that the shower was off during the conversation, and that following plaintiff's loss of consciousness, Ferguson went into the shower room and did not find it to be unusually hot.
31. Plaintiff experienced a number of events following the syncopal episode of February 6, 2002, in which she felt dizzy and light-headed which were unrelated to her work conditions.
32. The greater weight of the evidence shows that plaintiff's syncopal episode of February 6, 2002 was not related to her work conditions.
33. The greater weight of the evidence shows that there was no hazard incident to her employment which increased plaintiff's risk of injury from the fall.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. To be compensable, an injury must result from an accident, which is to be considered as a separate event preceding and causing the injury; the mere fact of injury does not of itself establish the fact of accident. N.C. Gen. Stat. § 97-2(6) and Bigelow v. Tire Sales Co.,12 N.C. App. 220, 182 S.E.2d 856 (1971).
2. Accident involves the interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences. Sanderson v. Northeast Constr. Co., 77 N.C. App. 117,334 S.E.2d 392 (1985).
3. If a fall results solely from an idiopathic cause or a physical infirmity, the nature of which is unknown, the injury is not compensable. Taylor v. Twin City Club, 260 N.C. 435, 132 S.E.2d 865
(1963); Cole v. Guilford County, 259 N.C. 724, 131 S.E.2d 308 (1963);Robbins v. Bossong Hosiery Mills, Inc., 220 N.C. 247, 17 S.E.2d 20
(1941). Where an employee falls due to an idiopathic condition, her injuries will be compensable to the extent they result from a hazard incident to the employment, which increased the risk of injury from the fall. Absent proof by the plaintiff of such increase in risk, the plaintiff's claim must fail. Taylor v. Twin City Club, 260 N.C. 435,132 S.E.2d 865 (1963); Allred v. Allred-Gardner, Inc., 253 N.C. 554,117 S.E.2d 476 (1960).
4. Plaintiff's syncopal episode on February 6, 2002 was not an injury by accident arising out of and in the scope of plaintiff's employment as there was no hazard which increased plaintiff's risk. N.C. Gen. Stat. §97-2(6).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 ORDER
1. Plaintiff's claim for workers' compensation benefits is hereby DENIED.
2. Each side shall pay its own costs.
This the ___ day of January, 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER